IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EUGENE E. GUTIERREZ,

    Plaintiff,

vs.                                                                Civ. No. 01-1229 JP/RLP

ANTHONY J. PRINCIPI, Secretary,
Department of Veterans Affairs,

    Defendant.

MEMORANDUM OPINION AND ORDER

On July 29, 2005, the Defendant filed a Motion for Summary Judgment (Doc. No. 40). Having considered the briefs, the oral argument presented by counsel at the October 13, 2005 pretrial conference, and the relevant law, the Court finds that Defendant's Motion for Summary Judgment should be granted.

A. Background

This is a Title VII lawsuit alleging 1) a hostile work environment based on Plaintiff's national origin (Hispanic), and 2) retaliation. Plaintiff alleges that these Title VII violations occurred because of his association with Randy Jiron, Plaintiff's former supervisor at the Veterans Affairs Medical Center (VAMC) in Albuquerque, New Mexico. Plaintiff alleges that Mr. Jiron made enemies in management because he was outspoken regarding "abuse, waste and fraud" being committed at the VAMC. Plaintiff was an inventory manager at the time the events at issue arose.[1]

---

[1] Plaintiff is still employed as an inventory manager at the VAMC.

1.  Mr. Jiron's Equal Employment Opportunity (EEO) Activity and Supervision of Plaintiff

Mr. Jiron initiated EEO proceedings against the VAMC in 1993 raising concerns about "waste, fraud and abuse" at the VAMC.  Plaintiff did not testify with respect to Mr. Jiron's 1993 EEO proceedings.  Mr. Jiron subsequently became a supervisor in Acquisition and Material Management Services at the VAMC from September 1995 until June 11, 1998.  Mr. Jiron supervised the Plaintiff until June 11, 1998.  After Mr. Jiron ceased to be Plaintiff's supervisor, Jose Padilla became Plaintiff's immediate supervisor.  Mr. Jiron's employment at the VAMC terminated on January 22, 1999.

On May 20, 1999, Mr. Jiron filed a second EEO complaint against the VAMC alleging employment discrimination based on national origin.  On October 18, 1999 the complaint was assigned to JDG Associates, Inc. for investigation.  Lee Mandell, an EEO investigator for JDG Associates, Inc., interviewed the Plaintiff in November or December 1999 regarding Mr. Jiron's 1999 EEO complaint.  Plaintiff did not testify on Mr. Jiron's behalf with respect to the second EEO complaint.

2.  Employment Actions Which Plaintiff Alleges Violated Title VII

The undisputed facts in the record, established by admissible evidence, are as follows.  On May 8, 1998, Plaintiff became aware that the operating room at the VAMC was calling for a custom heart pack for that morning.  Plaintiff had seen custom heart packs on the floor of the receiving area in the VAMC warehouse.  Plaintiff notified his supervisor that he had an order for this product and notified the prime vendor, American Medical Depot (AMD), that he was taking a custom heart pack from the warehouse.  Plaintiff, however, failed to fill out the proper

2

paperwork, or go through the proper channels to obtain the custom heart pack.  Mr. Akhil, an AMD employee working at the warehouse when Plaintiff took the custom heart pack, became upset with Plaintiff for taking the custom heart pack without following the proper procedures. Mr. Padilla later told Plaintiff not to go to the warehouse or to speak directly with the prime vendor regarding inventory, but rather to contact Kathy Ogilive, the contracting officer working with the prime vendor.

In June 1998, Bernard O'Loughlin, Chief of Acquisition and Material Management Services, removed credit cards assigned to Plaintiff and another employee.  Mr. O'Loughlin removed the credit cards in order to reduce unnecessary overnight shipping costs that were being billed to the credit cards.  Plaintiff alleges that he was not told why his credit card was removed.

Mr. O'Loughlin was also the approving official for the December 24, 1998 achievement awards. Supervisors recommended subordinates to Mr. O'Loughlin for the awards.  Four of Mr. Jiron's 18 subordinates received awards in December 1998.  Mr. Padilla, who was supervising members of the Ward Distribution Unit (WDU) team including Plaintiff at that time, informed Plaintiff that he would not get an award on December 24, 1998.  Mr. Padilla noted in his deposition that Plaintiff was performing satisfactorily but had some problems with stock outages. Deposition of Jose Padilla at 5, Ex. 10 (attached to Appendix of Exhibits to Defendant's Memorandum in Support of Motion for Summary Judgment, Filed 7/29/05 (Doc. No. 42), filed July 29, 2005).   In other words, in Mr. Padilla's opinion, the Plaintiff did not make any special accomplishments to justify an award for that year.  Plaintiff claims that Mr. Padilla should have given everyone in his department an award because the awards were not based on special accomplishments.  The employees who did not receive awards included Hispanics, Whites, and

Blacks who were all closely aligned with Mr. Jiron.

In addition to Mr. Padilla, Jon Penhallurick also directly supervised Plaintiff on occasion.[2] Plaintiff claims that Mr. Penhallurick frequently yelled at him for not doing his job correctly, singled Plaintiff out, and sent harassing e-mails to Plaintiff.[3] For instance, Mr. Penhallurick incorrectly accused the Plaintiff at a meeting of not sharing information and proceeded to yell at the Plaintiff. Mr. Penhallurick also was not pleased with Plaintiff's participation in the WDU team because Plaintiff was not cooperating with the team. In January 1999, Mr. Penhallurick had Plaintiff removed from the WDU team after the Plaintiff indicated that he did not want to be on the team. Plaintiff did not lose any pay when he left the WDU team.

Also in January 1999, Mr. Padilla reassigned Plaintiff to the operation room to implement a new automated inventory system. Prior to the reassignment the Plaintiff had been in charge of the inventory for the entire hospital. Shortly after the Plaintiff was reassigned to the operation room, he left for military training. When the Plaintiff returned from military training, Plaintiff worked in the operation room for less than a year. According to Mr. Padilla, Plaintiff was reassigned to the operation room because Plaintiff was most familiar and knowledgeable about the needs of the operating room. After the Plaintiff was finished with the operating room assignment, he returned to his usual job responsibilities at the VAMC.

On April 5, 1999, Mr. Penhallurick asked Plaintiff to get some work done. Plaintiff

---

[2]Mr. Penhallurick was apparently Mr. Padilla's direct supervisor and Mr. O'Loughlin directly supervised Mr. Penhallurick.

[3]Plaintiff does not present any of the allegedly harassing e-mails as evidence.

disagreed with Mr. Penhallurick on how to do the work and stormed out of Mr. Penhallurick's office. A few minutes later, Plaintiff returned and told Mr. Penhallurick that he was going home because he was sick. Mr. Penhallurick stated to Plaintiff that he did not believe Plaintiff was really sick but gave Plaintiff permission to go to the employee health physician. Mr. Penhallurick indicated that if the employee health physician found that the Plaintiff was ill, Plaintiff could go home. In fact, the employee health physician sent the Plaintiff home. However, it is unclear from the record whether the employee health physician actually determined that the Plaintiff was ill.

    3. Plaintiff's EEO Activity

On February 10, 1999, several weeks after Mr. Jiron had left the VAMC, Plaintiff first contacted an EEO counselor regarding his complaints of ongoing harassment and reprisal for associating with Mr. Jiron. Plaintiff's first interview with the EEO counselor was on April 5, 1999 when Plaintiff also raised the issue of a hostile work environment. Plaintiff's final interview with the EEO counselor occurred on May 6, 1999. Plaintiff submitted an EEO Complaint of Employment Discrimination on May 26, 1999. On August 5, 1999, the Department of Veterans Affairs, Office of Resolution Management, accepted Plaintiff's complaint of discrimination for investigation.

Plaintiff does not allege he lost wages as a result of the alleged hostile work environment and retaliation, but he alleges that his chances for promotion became nonexistent because of the hostile work environment and retaliation.

B. Discussion

    The Defendant argues that he is entitled to summary judgment on both the hostile work

5

environment claim and the retaliation claim.  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

     1.  Hostile Work Environment

"For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998), *cert. denied*, 526 U.S. 1039 (1999)(quotation omitted)(emphasis added).  The plaintiff who alleges racial discrimination based on a hostile work environment must show harassment stemming from racial animus. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied*, 516 U.S. 826 (1995).  "[G]eneral

torment and taunting if not racially discriminatory are not actionable." *Id*. To determine whether a work environment is hostile, the Court examines the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Moreover, the work environment must be both subjectively and objectively hostile.  *Id*. at 21-22.

Considering the totality of the circumstances in this case I find that the actions of Mr. Penhallurick, Mr. Padilla, and Mr. O'Loughlin were not severe enough to constitute a racially hostile work environment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment...."). Furthermore, the actions of Mr. Penhallurick, Mr. Padilla, and Mr. O'Loughlin were not "pervasive," i.e., they did not constitute  "a steady barrage of opprobrious racial comments."  *See Bolden*, 43 F.3d at 551.  The Plaintiff failed to produce sufficient evidence to raise a genuine factual issue as to whether the conduct of Mr. Penhallurick, Mr. Padilla, and Mr. O'Loughlin stemmed from any racial animus.  Since Plaintiff has not demonstrated that "a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment," the Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

2.  Retaliation

Title VII prohibits an employer from discriminating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he

has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter." 42 U.S.C. §2000e-3(a).  In analyzing Title VII retaliation claims, courts apply the burden-shifting approach set forth in *McDonnell Douglas*.  First, a plaintiff must establish a *prima facie* case of retaliation.  *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973).  To establish a *prima facie* case of retaliation, the plaintiff must show that (1) the plaintiff engaged in protected conduct; (2) the plaintiff was subject to an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action.  *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).  Once the plaintiff makes a *prima facie* showing, the defendant must articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Id*.  The plaintiff must then respond by showing that the defendant's reasons for the adverse employment action are pretextual.  *Id*.

    a.  *Prima Facie* Case of Retaliation

      (1)  Protected Conduct

Although it is not entirely clear, the Plaintiff apparently argues that his protected conduct consisted of being named a witness with respect to Mr. Jiron's May 20, 1999 EEO complaint. Plaintiff states in his deposition that he did not recall when he was "summoned" as a witness for Mr. Jiron but that it must have been in the 1998 to 1999 time frame.  Deposition of Eugene Gutierrez at 79-80 (attached to Appendix of Exhibits in Response to Defendant's Motion for Summary Judgment (Doc. No. 47), filed Aug. 30, 2005).  The record, however, does not contain a summons or subpoena for Plaintiff to testify on Mr. Jiron's behalf.  The only evidence regarding the earliest date that Mr. Jiron could have named Plaintiff as a witness during that time frame is Mr. Jiron's May 20, 1999 EEO complaint which does not list Plaintiff as a witness.

Even if being named a witness on Mr. Jiron's behalf is protected conduct, Plaintiff fails to present specific factual evidence that any of Plaintiff's supervisors knew that Mr. Jiron had identified Plaintiff as a witness.  "[A]n employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII."  *Lyons v. Red Roof Inns, Inc.*, 130 Fed. Appx. 957, 965 (10th Cir. 2005)(quotation omitted).  Consequently, Plaintiff has failed to show that a rational juror could find that Plaintiff established the first element of a *prima facie* case of retaliation.

(2)  Adverse Employment Actions

The Plaintiff also argues that he was subjected to the following adverse employment actions:  "Specifically, his duties were changed, he lost income from not receiving an annual award, and the general treatment he received hurt his chances of upward mobility."  Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. No. 46) at 8, filed Aug. 29, 2005.  To meet the adverse action element, the Plaintiff must show that the adverse action occurred "either after or contemporaneous with the employee's protected action."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997).  Plaintiff's reassignment to the operating room, removal from the WDU team, and failure to obtain the 1998 award all preceded the filing of Mr. Jiron's May 20, 1999 EEO complaint, the presumed basis of Plaintiff's retaliation claim.  Those actions, therefore, cannot constitute adverse employment actions with respect to this retaliation claim.

Plaintiff's contention that his upward mobility was limited is apparently based on Mr. Penhallurick's general treatment of Plaintiff, i.e., Mr. Penhallurick's yelling at Plaintiff, singling Plaintiff out, and sending harassing e-mails to Plaintiff.  Plaintiff's Response at ¶25.-26. Viewing

the evidence in the light most favorable to the Plaintiff, the Court will assume that Mr. Penhallurick's general treatment of Plaintiff continued as Plaintiff alleges after Mr. Jiron filed his May 20, 1999 EEO complaint. The phrase "adverse employment action" is liberally defined in the Tenth Circuit. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003)(citation omitted). An adverse employment action occurs when there is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citation and quotations omitted). "To be an adverse action, the employer's conduct must be 'materially adverse' to the employee's job status." *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003)(citations omitted). Plaintiff's allegations about Mr. Penhallurick's general behavior towards him do not include any specific factual allegations that Mr. Penhallurick's post-May 20, 1999 behavior led to a decrease in Plaintiff's pay, a denial of a promotion, or a significant change in job duties. In other words, the Plaintiff does not provide facts which show that Mr. Penhallurick's post-May 20, 1999 actions were "materially adverse" to the Plaintiff's job status. To conclude, a rational juror could not find that Plaintiff suffered any adverse employment action.

                (c)  Causal Connection

As noted above, the change in Plaintiff's job duties and the lost income from not receiving a 1998 award occurred prior to the filing of Mr. Jiron's May 20, 1999 EEO complaint. Consequently, there is no causal connection between Plaintiff possibly being a witness with respect to Mr. Jiron's May 20, 1999 EEO complaint and those alleged adverse employment actions. Mr. Penhallurick's yelling at Plaintiff, singling Plaintiff out, and sending harassing e-mails to Plaintiff apparently occurred both prior to the filing of Mr. Jiron's 1999 EEO complaint as well

as afterwards.  There is no indication that Mr. Penhallurick's behavior intensified after Mr. Jiron filed the May 20, 1999 EEO complaint.  Since Mr. Penhallurick's behavior towards Plaintiff did not seem to change after Mr. Jiron filed his May 20, 1999 EEO complaint, the Court is hard pressed to find that the Plaintiff has established a causal connection between Plaintiff being a potential witness with respect to Mr. Jiron's May 20, 1999 EEO complaint and Mr. Penhallurick's post-May 20, 1999 behavior.  The Plaintiff has simply failed to show that a rational juror could find that there was a causal connection between Plaintiff potentially serving as a witness in conjunction with Mr. Jiron's May 20, 1999 EEO complaint and any of the alleged adverse employment actions.  In sum, the Court finds that the Plaintiff has failed to provide evidence of a *prima facie* case of retaliation.

> b.  Defendant's Legitimate, Nondiscriminatory Reasons for Adverse Employment Actions and Plaintiff's Burden to Show Pretext

Assuming for the sake of argument that the Plaintiff had provided evidence of a *prima facie* case of retaliation, the next step in the *McDonnell Douglas* test requires the Defendant to articulate legitimate, nondiscriminatory reasons for the alleged adverse employment actions.  The Defendant does this by stating the following:

> Penhallurick requested that Plaintiff and others surrender government issued credit cards as a cost saving measure; Plaintiff was instructed not to contact the Prime Vendor directly because his actions in May 1998 had violated established protocol; Plaintiff was not nominated for an award because he made no special contribution during the previous year; and, Plaintiff was detailed to the operating room because management believed that he was the best qualified employee to establish the new electronic ordering system.

Memorandum in Support of Motion for Summary Judgment (Doc. No. 41) at 18 n.6, filed July 29, 2005.  Curiously, the Plaintiff does not respond to these legitimate, nondiscriminatory reasons with either argument or evidence of pretext.  Since Plaintiff could not establish a *prima facie* case

11

of retaliation and since Plaintiff failed to address the issue of pretext, the Court concludes that the Defendant is entitled to summary judgment on the retaliation claim.

IT IS ORDERED that Defendant's Motion for Summary Judgment (Doc. No. 40) is granted and Plaintiff's claims against the Defendant will be dismissed with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE